# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5296 | **DATE** | 12/30/2002 |
| **CASE TITLE** | Kozlowski et al. vs. Rita Fry et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box **above**.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Memorandum Opinion and Order entered. Defendants' Motion for Summary Judgment on all counts [#68] is **granted in part and denied in part**; Plaintiffs' Motion for Summary Judgment on Counts III, IV and VI only [#71] is **denied**. *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | 2 number of notices | |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | DEC 3 1 2002 date docketed | |
| | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | 12/30/2002 date mailed notice | |

FT/ *secy* courtroom deputy's initials

U.S. DISTRICT COURT
CLERK
02 DEC 30 PM 4: 07

Date/time received in central Clerk's Office

FT mailing deputy initials

**Document Number**

95

DOCKETED
DEC 3 1 2002

CAMILLE KOZLOWSKI, DARLENE      )
WILLIAMS, SUSAN HORN, VICKI     )
ROGERS, MOSES COLLINS, MARC     )
MILLER, and KENNETH FLETCHER    )
                                )   Case No. 00 C 5296
            Plaintiffs,         )
                                )
                                )
        v.                      )
                                )
                                )
RITA FRY, in her official       )   Magistrate Judge
capacity as Cook County Public  )   Arlander Keys
Defender, and COUNTY OF COOK,   )
                                )
            Defendants.         )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment on all counts and Plaintiff's Motion for Summary Judgment on Counts III, IV, and VI.[1]  For the reasons set forth below, the Court grants in part and denies in part the parties' respective motions.

---

[1]  The Court dismissed Count VI of Plaintiffs' Second Amended Complaint on October 18, 2002, and therefore, summary judgment on Count VI is moot.

## FACTS[2]

Camille Kozlowski, Darlene Williams, Susan Horn, and Vicki Rogers ("Female Plaintiffs") are women employed as Attorney Supervisors in the Cook County Public Defender's Office (the "Public Defender's Office"). (Pls.' 56.1 ¶¶ 1, 7.) Moses Collins, Kenneth Fletcher, and Marc Miller ("Male Plaintiffs")("Female Plaintiffs" and "Male Plaintiffs" are hereinafter collectively referred to as "Plaintiffs") are men who are employed as Attorney Supervisors in the Public Defender's Office. (*Id.* ¶¶ 2, 7.)

Defendant Rita Fry is the Public Defender of Cook County, and was appointed to her position in February 1992. (*Id.* ¶ 3.) Defendant Cook County is a political subdivision established by the laws of the State of Illinois and is Plaintiffs' employer. (*Id.* ¶ 4.) Defendants are subject to the consent decree in *Shakman v.*

---

[2] In addition to their reply brief, Defendants filed a Reply to Plaintiffs' Response to Defendants' Rule 56.1 Statement ("Rule 56.1 Reply"). However, such a submission by Defendants is neither appropriate nor necessary under the Local Rules. *See,* N.D. ILL. LOC. R. 56.1; *White v. Sundstrand Corp.*, No. 98 C 50070, 2000 WL 713739, at *2 (N.D. Ill. May 23, 2000), *aff'd*, 256 F.3d 580 (7th Cir. 2000), *cert. denied*, 122 S. Ct. 666 (2000). If Defendants objected to any of Plaintiffs' responses to Defendants' 56.1 Statement, the proper remedy would have been for Defendants to move to strike the allegedly improper paragraphs. The Court is satisfied that it has a complete set of facts in this case as supplied by both parties in their respective Rule 56.1 Statements and corresponding Responses, and their Statements of Additional Facts and corresponding Responses. Therefore, the Court will not consider Defendants' unnecessary Rule 56.1 Reply in this opinion.

*Democratic Org. of Cook County, Ill.*[3]  (*Id.* ¶ 48.)

The Public Defender's Office has 53[4] supervisory attorneys, of which 15 are women.  (*Id.* ¶ 8.)  Supervisory attorneys[5] are designated as Attorney Supervisors, Chiefs, and Directors, and the salary levels for such attorneys range from the lowest level D1 through the highest D11.[6]  (*Id.* ¶ 9.)  The Public Defender's Office is divided into four Operational Units, with each such Unit supervised by a Director.  (Defs.' 56.1 ¶¶ 27-29.)[7]  The Directors

---

[3]  481 F. Supp. 1315, 1358 (N.D. Ill. 1979), *vacated by Shakman v. Dunne*, 829 F.2d 1387 (7th Cir. 1987), *cert. denied*, 484 U.S. 1065 (1988); *see also Shakman v. Democratic Org. of Cook County*, 569 F. Supp. 177 (N.D. Ill. 1983).  The *Shakman* ruling prohibits the hiring of government employees based on political affiliation or motivation, unless the positions have been declared "exempt" pursuant to an order by a court of law.  569 F. Supp. at 182.

[4]  Inexplicably, Defendants' 56.1 Statement declares the number of supervisory attorneys at 55, to which Plaintiffs admit in their response.  (Defs.' 56.1 ¶ 18; Pls.' 56.1 Resp. ¶ 18; *see also* Pls.' 56.1 ¶ 8; Defs.' 56.1 Resp. ¶ 8.)  However, the actual number of supervisory attorneys is not material to the Court's analysis herein.

[5]  To alleviate any confusion in the use of certain terminology in this opinion, the Court's use of the capitalized term "Attorney Supervisor" identifies the subgroup of attorneys under the general "supervisory attorneys" or "attorney supervisor" category.  "Supervisory attorneys," or the uncapitalized "attorney supervisors," encompasses not only Attorney Supervisors, but Chiefs and Directors as well.

[6]  The Public Defender, Ms. Fry in this Case, is the sole D12, and the First Assistant Public Defender is D11.  (Defs.' 56.1 ¶ 19.)

[7]  The citations to the Exhibits in Plaintiffs' Response to Defendants' Rule 56.1 Statement, which also contains Plaintiffs'
(continued...)

are at the highest level and report to the First Assistant Public Defender; Chiefs report to Directors and supervise Divisions within the Operational Units; Attorney Supervisors report to Chiefs and supervise the line attorneys within each Division who provide legal services to the clients of the Public Defender's Office. (*Id.*) Other duties of the Attorney Supervisors include, strategy, case development and trials, supervising the courtrooms where the line attorneys work, conferring with judges, and handling personnel matters relating to the line attorneys. (*Id.*) Attorney Supervisors are *Shakman* positions, and therefore subject to the *Shakman* decree. (*Id.* ¶ 59.)

All attorney supervisors at a particular grade earn the same salary. (*Id.* ¶ 20.) The higher the grade, the greater the salary associated with the position. (*Id.*) The D10 positions are held by Directors, the D8 and D9 positions are held by Chiefs,[8] and D1

---

[7](...continued)
Statement of Additional Facts, oddly do not appear to correspond to the correct exhibits therein. The Court, however, has determined that the misnumbering is off by one – thus, a citation to "Exhibit 1" should actually be to "Exhibit 2," and so forth. Although certainly not required, the Court has discretion to scour the record if it so chooses, and given the fact that the misnumbering appears to be off by only one exhibit, the Court will disregard Plaintiffs' citations to the record and find the correct exhibits on its own. However, the Court urges Plaintiffs to carefully number all exhibits in the future or face the prospect of the Court finding no evidentiary support for their statements of fact.

[8] Training Chiefs are allegedly graded D-5. (Defs.' 56.1 ¶ 19.)

through D7 positions are held by Attorney Supervisors. (*Id.* ¶ 19.)

The salary system at the Public Defender's Office is not merit-based, and therefore, employee evaluations play no role in determining salary increases (Pls.' 56.1 ¶¶ 31-34 ) nor in filling vacancies (Defs.' 56.1 ¶ 84). One way for an Attorney Supervisor to increase her salary is to be selected, or promoted, to fill a vacant supervisory attorney position which is graded higher than her current position. (*Id.* ¶ 25, 64.) The only other way an Attorney Supervisor can increase her salary is by having her grade increased through a process called "reclassification" (*Id.* ¶ 24), but Ms. Fry must get approval for this action (*Id.* ¶ 172).

Ms. Fry makes the decision as to which D-grade a person is assigned when filling vacant supervisory attorney positions. (Pls.' 56.1, Ex. I at 19.) However, she has no ability to change the grade of the position when filling a vacancy, and cannot fill any supervisory attorney position unless it is vacant. (Defs.' 56.1 ¶¶ 96, 97.) Ms. Fry testified that the D ranks are not tied to specific responsibilities because of her frequent need to move supervisors around when vacancies arise. (Pls.' 56.1 Resp. ¶ 62, Ex. 5. at 94.) Ms. Fry also stated that a vacancy in a certain division may require her to move a supervisor from one division to the next, regardless of the supervisors' respective salaries at the time of the move. (Pls.' 56.1, Ex. I at 18-19.) She explained that working in a particular division does not necessarily govern

5

what one's salary is to be, because she could not always tie salaries to the supervisors' movements. (Pls.' 56.1 ¶ 34, Ex. I at 18-19, 26-27; Defs.' 56.1 Resp. ¶ 34.)   However, Ms. Fry also testified that experience or type of supervisory work is connected to someone's designation as a D1 through D11. (Pls.' 56.1, Ex. I at 26-27.)   Where possible, Ms. Fry explained that a felony supervisor should be paid more than a supervisor in the First Municipal division (id. at 18), but would not necessarily be paid more than a supervisor in the juvenile division (Id. at 17-18). However, an individual from Defendants' personnel department testified that nothing in the Public Defender's Office classification system dictates that a person working in a particular division, such as misdemeanors, should be a D1 and someone working in the felony division should be a D4. (Pls.' 56.1 Resp. ¶ 62, Ex. 7 at 28.)

When seeking to fill a supervisory attorney position, Ms. Fry recommends individuals to Cook County Board President John Stroger for approval. (Defs.' 56.1 ¶ 93.)   Ms. Fry and President Stroger never discuss any such candidates, but Ms. Fry's recommendations are approved as a matter of course. (Id. ¶¶ 94, 95.)   Ms. Fry does not consider a candidate's political affiliation when she fills vacancies, nor was she aware of the political affiliations of the candidates which she recommended for various supervisory positions. (Id. ¶¶ 101, 106, 110, 115, 118, 121, 124, 127, 130, 133, 136, 140,

143, 146, 149, 152, 155, 158, 161, 164, 168, 171, 186, 192, 200, 205, 211, 218, 225.)

For *Shakman* positions, Defendants continuously post a notice for D1 through D4 positions. (*Id.* ¶ 66, 70). The D1 through D4 positions require no specific qualifications beyond what the actual posting indicates on its face. (Pls.' Add. Facts ¶ 152-58, Ex. 8.) In contrast, Defendants do not advertise or post openings for positions above D5. (*Id.* ¶ 156-57.) However, in December 2000, some *Shakman* supervisory positions were reclassified and are now graded D5 through D8. (Defs.' 56.1 ¶ 71.) Since December 2000, the continuous notice posted expressly for D1 through D4 positions applies for all *Shakman* supervisory attorney positions, including those now graded D5 through D8. (*Id.* ¶ 71.)

When the Public Defender's Office anticipates a vacancy, the hiring committee, comprised of Chiefs and Directors, convenes. (*Id.* ¶¶ 76, 77.) The interview committee interviews candidates for supervisory positions and makes a recommendation to Ms. Fry, not for a particular vacancy either in terms of pay or assignment, but rather issues a generic recommendation that a candidate is qualified to fill any vacancy that might open up in the office. (Pls.' Add. Facts ¶ 107.) These recommended candidates are placed on the "must hire" list, and Ms. Fry considers the candidate for the next vacancy with other "must hires." (Defs.' 56.1 ¶ 81, 86). Ms. Fry is not obligated to accept the interview committee's

recommendations and may choose another candidate based on her own subjective reasons. (Pls.' Add. Facts ¶ 126-27; Defs.' Resp. Add. Fact ¶ 126-27, Pls.' 56.1 Resp., Ex. 11 at 37.) Defendants allege that the hiring committee has not convened since January 1999. (Defs.' 56.1 ¶ 83).

In 2000, Ms. Horn, Ms. Kozlowski, and Ms. Williams completed applications for promotion. (*Id.* ¶¶ 197, 202, 222.) Neither Ms. Horn, Ms. Kozlowski, nor Ms. Williams have been interviewed for these positions. (*Id.* ¶¶ 198, 203, 223.) Ms. Horn and Ms. Williams had previously applied and interviewed for a promotion in 1996, but were not placed on the "must hire" list. (*Id.* ¶ 195, 220.) However, Ms. Horn spoke to Ms. Fry about the promotion, was subsequently hired as an Acting Chief, but later declined to continue in the position in a permanent capacity. (*Id.* ¶ 196.) Ms. Rogers never completed an application for promotion (*id.* ¶ 217), but she claims that she approached Ms. Fry about a promotion to Director but the position went to another woman (*Id.* ¶ 213). Ms. Rogers has not approached Ms. Fry again about any positions. (*Id.* ¶ 215.) Since 1996, Ms. Horn has not, nor have Ms. Kozlowski nor Ms. Williams ever, approached Ms. Fry about vacancies, nor has Ms. Fry ever approached them about such positions. (*Id.* ¶¶ 199, 204, 214-215, 224). In addition, Ms. Fry has not offered Ms. Horn a second Chief position because she advised Ms. Fry that she did not want the Chief position in the Fifth Municipal Division. (*Id.* ¶

8

199.)

Female Plaintiffs have worked in several divisions, including felony trial, with the exception of Ms. Rogers, who has only worked in the appeals division. (*Id.* ¶¶ 193, 201, 212, 219.) Ms. Horn has been an Attorney Supervisor since 1997, and briefly held a position as an Acting Chief. (*Id.* ¶ 193.) Ms. Kozlowski and Ms. Rogers have been Attorney Supervisors since 1997 and 1998, respectively. (*Id.* ¶¶ 201, 212.) For a brief period, Ms. Williams served as an Acting Chief, but otherwise she has been an Attorney Supervisor since 1994. (*Id.* ¶ 219.)

Male Plaintiffs Moses Collins, Kenneth Fletcher and Marc Miller are Attorney Supervisors. (*Id.* ¶¶ 180, 187, 206.) Mr. Collins was hired as an assistant public defender in 1979, and has worked as an Attorney Supervisor in various divisions, including felony. (*Id.* ¶ 180.) In 1991, Mr. Collins approached Ms. Fry about a promotion to First Assistant Public Defender, but the job instead went to another man. (*Id.* ¶ 182.) Mr. Fletcher has been an Attorney Supervisor since 1989, and has worked in various divisions, including the murder task force, and is currently in felony. (*Id.* ¶ 187.) Mr. Fletcher applied for a promotion in 1996, but was unsuccessful in obtaining the position. (*Id.* ¶ 189, 191.) Mr. Miller has been an Attorney Supervisor since 1989, and has worked in various divisions, including felony and murder. (*Id.* ¶ 206.) In 1997, Mr. Miller interviewed for a promotion, but he

was not placed on the "must hire" list and did not receive a promotion. (Id. ¶ 208, 210.)

In 1992, Ms. Fry filled the position of First Assistant Public Defender with a male. (Id. ¶¶ 99, 100.) She also filled two alleged policymaking supervisory attorney positions - one in 1993 with a woman and the other in 1995 with a man. (Id. ¶ 165-67, 170.) Between 1992 and 1995, Ms. Fry also filled at least three[9] Director vacancies - with a woman and two men. (Defs.' 56.1 ¶¶ 102, 105, 110.) Further, between 1996 and 1998, and again in 2000, Ms. Fry filled at least nine[10] Chief vacancies - with five men and

---

[9] Defendants claim that only two Director vacancies were filled. (Defs.' 56.1 ¶ 102.) Plaintiffs counter that Ms. Fry also promoted Xavier Velasco, James Reddy and perhaps others to Director positions. (Pls.' 56.1 Resp. ¶ 102.) However, the exhibit to which Plaintiffs cite only shows Mr. Velasco as a Director, graded D10, and a letter signed by Ms. Fry in 1995 informing him of his promotion. (Id.) Mr. Reddy and Mr. Atkins are designated as "promoted" or "hired," respectively, into Chief positions. (Pls.' 56.1 Resp., Ex. 21.) A document apparently from the Public Defender's Office personnel department shows that Mr. Reddy has been promoted from a D7 to a D8, Shakman position, which requires no "special requirements beyond the minimum skills, knowledge, abilities and qualification in the job description for the position." (Id.) Another personnel document shows Mr. Atkins as a new hire, graded D6, but the designation says that his title is Chief and that it is a Shakman position. (Id.) The personnel documents indicate that the remaining men were reclassified into D8 positions in December, but there is no evidence as to whether these men were in Shakman or alleged Shakman-exempt positions. (Id.)

[10] Plaintiffs argue that Ms. Fry hired, promoted or increased the pay of six other men not identified in Defendants' 56.1 Statement, and further allege that Ms. Fry's deposition testimony indicates that she only promoted four Chiefs. (Pls.' 56.1 Resp. ¶ 111.) However, the Court could not locate the

(continued...)

two women. (*Id.* ¶ 111, 114, 117, 120, 123, 126, 129, 132, 135.)
Further, between 1997 and 2000, Ms. Fry filled nine[11] Attorney
Supervisor vacancies with at least six men and five women. (*Id.* ¶
137, 139, 142, 145, 148, 151, 154, 157, 160, 163.)

Specifically, in December 1999, she promoted Richard Hutt and
Wendy Schilling, who at the time were line attorneys, to fill D3
vacancies in the civil division. (*Id.* ¶ 231.) In January 2000,
she hired Ramon Ocasio, who at the time did not work for the Public
Defender's Office (Pls.' Add. Fact ¶ 13), for another D3 position
in the civil division (Defs.' 56.1 ¶ 231).

On March 24, 2000, after learning that these three individuals
were hired for the D3 Attorney Supervisor vacancies, Plaintiffs
sent a letter to Ms. Fry, stating that they believed the decision
to hire the three individuals reflected sex discrimination. (*Id.*
¶ 233.) Plaintiffs believed that it was unfair that these new

---

[10](...continued)
deposition pages 98-99 in Exhibit 5 that Plaintiffs claim shows
Ms. Fry's contradictory testimony. Further, the payroll printout
that identifies the men who apparently were promoted or received
pay increases does not prove what Plaintiffs allege – the
document only shows individuals, and their respective grade
levels, and indicates "super" for practically everyone on the
list. (*Id.*) Further, the list does not indicate what the
individuals' original salary was before the purported increases.
Thus, looking at this list alone, there is no way to tell if
their salaries were increased or if they received a promotion.
However, according to other portions of the record, Mr. Reddy was
also promoted to Chief by Ms. Fry. (Pls.' 56.1 Resp., Ex. 21).

[11] Defendants allege that eight Attorney Supervisor
positions were filled, but apparently, they forgot to count
Moroba Matsapola, who was hired in 1998. (Defs.' 56.1 ¶ 147.)

Attorney Supervisors were earning more than some of them and were graded equal to or higher than them. (*Id.* ¶ 232.) In the letter, Plaintiffs requested a meeting with Ms. Fry to discuss the matter of sex discrimination at the Public Defender's Office. (Defs.' 56.1, Ex. 27.)

Ms. Fry testified that she met with Ms. Kozlowski, Ms. Williams, Ms. Rogers, Mr. Miller, and Mr. Collins on April 10, 2002. (Defs.' 56.1 ¶ 234; Pls.' 56.1 Resp. ¶ 234, Ex. 5 at 36). Ms. Fry testified that at the meeting, the spokesperson for the group, Ms. Kozlowski, stated that she felt that women were not being promoted at the Public Defender's Office, and that women should have more opportunities for higher graded positions. (Pls.' 56.1 Resp., Ex. 5 at 37.) Ms. Fry responded by saying that she could only fill positions when there were vacancies. (*Id.* at 37-38.) Plaintiffs claim that Ms. Fry also told them at the meeting that "there had been discrimination, but it was not intentional." (Defs.' 56.1 ¶ 234.) Ms. Fry denies making such a statement. (*Id.* ¶ 235.)

In April 2000, Ms. Horn, Ms. Williams, and a non-Plaintiff, Deborah Niesen, received higher graded classifications. (Pls.' 56.1 Resp. ¶ 178, Ex. 5 at 80, Ex. 30[12]). Each woman went from a

---

[12] Plaintiffs erroneously cite to Exhibit 22 as evidence of the women's payroll changes. However, Exhibit 22 contains nothing but a one page excerpt of an unidentified individual's deposition testimony. In addition, since the Court has

(continued...)

D2 to D4 grade. (Defs.' 56.1 ¶¶ 193, 219, 178; Pls.' 56.1 Resp. ¶¶ 193, 219, 178). The increase in salaries did not coincide with an increase in the women's work responsibilities (Pls. Add. Facts ¶ 28.)

In 1999 or 2000, Ms. Fry sought to reclassify D1 through D3 Attorney Supervisor positions to remedy the inequality in pay between supervisors and their subordinates. (Defs.' 56.1 ¶ 174.)[13] In December 2000, Ms. Kozlowski was reclassified from D1 to D3, Mr. Collins was reclassified from a D4 to a D7, and Mr. Fletcher from a D2[14] to a D3 (*Id.* ¶ 179).

_____

[12] (...continued)
previously found that the exhibits are misnumbered, the Court notes that Exhibit 23 similarly does not support Plaintiffs' statement, rather it contains nothing but a table listing various positions at the Public Defender's Office and the corresponding salaries for those positions. Luckily for Plaintiffs, the Court found the said payroll documents on its own in Exhibit 30. Plaintiffs' continuous lack of attention to detail is alarming and certainly puts a strain on the Court's time and attention. Plaintiffs are urged to engage in a more careful assessment of their practices and, in the future, verify that all citations to the record are correct and contain the information which purportedly support their allegations.

[13] Ms. Fry's affidavit states that she sought this reclassification in 1997. (Defs.' 56.1 ¶ 174, Ex. 14 ¶ 89.) On October 23, 2002, the Court issued a minute order declaring that any contradictory statements made by Ms. Fry in her deposition and in her affidavit would be resolved by looking to her deposition testimony, but only to the extent Plaintiffs pointed out the contradictions. Thus, for purposes of its analysis, the Court uses the date that Ms. Fry stated in her deposition.

[14] Plaintiffs' Response to Defendants' 56.1 Statement counters that Mr. Fletcher was a D1 until his reclassification, but the document cited by Plaintiffs to support this claim indicates that Mr. Fletcher was actually a D2. (Pls.' 56.1 Resp. ¶ 187, Ex. 6.)

Having not been reclassified or promoted, Mr. Miller remains a D4. (Defs.' 56.1 ¶ 206; Pls.' 56.1 Resp. ¶ 206.) Similarly, Ms. Rogers remains a D5. (Pls.' 56.1 ¶ 10.)

Plaintiffs filed charges of discrimination with the Equal Employment Opportunity Commission, and on August 29, 2000, Plaintiffs received a Notice of Right to Sue Letter. (Defs.' 56.1 ¶¶ 236-37.) Plaintiffs filed the instant lawsuit on August 29, 2000 in federal court, and subsequently consented to proceed before this Court. Plaintiffs filed their Second Amended Complaint on March 29, 2002. Both parties have moved for summary judgment, and the parties' respective motions are the subject of this opinion.

## DISCUSSION

### I.   Summary Judgment Standard

Courts should grant summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1985). Initially, the moving party bears the burden of showing that the record contains no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The non-moving party must present more than a "metaphysical doubt as to the material facts" to survive summary judgment.

14

*Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Additionally, "mere conclusory" allegations are not enough. *Nowak v. St. Rita High School*, 142 F.3d 999, 1002 (7th Cir. 1998). The non-moving party will not survive summary judgment if she cannot present sufficient evidence to support each element of her case on which she will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

Courts do not make "credibility determinations nor choose between competing inferences" at the summary judgment stage. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1041 (7th Cir. 1993). Further, the court must view the facts in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255.

In addition, pursuant to Northern District of Illinois Local Rule 56.1, the parties must support all disputed facts with "specific references to . . . parts of the record. . . ." The Seventh Circuit has articulated that courts need not "scour the record" in an attempt to locate the relevant information supporting the 56.1 claims. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994)

## II.  **Title VII**

In Count I, Plaintiffs charge Defendants with sex discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Title VII prohibits sex discrimination of employees by employers.

15

42 U.S.C. § 2000e *et seq.* With Title VII's enactment, Congress intended to "achieve equality of employment opportunities and remove barriers that have operated in the past to favor" some groups over others in the employment setting. *Griggs v. Duke Power Co.*, 401 U.S. 424, 429-30 (1971).

Plaintiffs may prove sex discrimination under Title VII by showing either "disparate impact" or "disparate treatment." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983-986 (7th Cir. 2001)(termination case). Whether plaintiffs prove that their employer intentionally discriminated against them or unintentionally discriminated against them is irrelevant, because a finding of either is a violation of Title VII. *See, DeClue v. Cent. Ill. Light Co.*, 223 F.3d 434, 436 (7th Cir. 2000). To maintain their claim under Title VII, Male Plaintiffs must prove that they were injured as a result of the discrimination against Female Plaintiffs. *Allen v. Am. Home Foods, Inc.*, 644 F. Supp. 1553, 1556 (N.D. Ind. 1986).

The facts in this case are somewhat unique compared to other Title VII cases that the Court has studied. Typically, plaintiffs do not provide courts with "smoking gun" type of evidence that proves the employer engaged in discriminatory practices against a protected group. However, the record currently before this Court shows that a genuine issue of material fact exists as to whether Ms. Fry actually admitted that discrimination occurred at the

Public Defender's Office. Thus, the typical application of the disparate impact or disparate treatment tests are not necessary, because Defendants have arguably proved Female[15] Plaintiffs' prima facie case for them, and rebutted any defenses Defendants might raise, by admitting liability (if the statement is found to be true). Certainly, Female Plaintiffs must be given an opportunity to present this inculpatory evidence to a jury. As this alleged admission is a material fact in dispute, and involves a determination of Ms. Fry's credibility, the Court must deny summary judgment on Count I of Female Plaintiffs' claim. Nevertheless, assuming, *arguendo*, that Female Plaintiffs still must prove the elements of a prima facie case under Title VII, the Court finds that Ms. Fry's alleged admission is at least some evidence of pretext under both disparate treatment and disparate impact theories of liability.

### A. **Disparate Treatment**

To show disparate treatment, a plaintiff must prove that her employer intentionally treated her less favorably than men. *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513 (7th Cir. 1996). A plaintiff may present either direct evidence of intentional discrimination, or may use the indirect, burden-shifting method,

---

[15] As further discussed below, Male Plaintiffs have not put forth any evidence showing that they have suffered an injury as a result of discrimination against the Female Plaintiffs. Although Ms. Fry's alleged admission of discrimination is enough to sustain Female Plaintiffs' charge of discrimination against Defendants, Male Plaintiffs cannot survive summary judgment by relying on mere conclusory allegations.

established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973) to show disparate treatment. *Kirk v. Fed. Prop. Mgmt. Corp.*, 22 F.3d 135, 138 (7th Cir. 1994).

### 1. **Direct Evidence**

Direct evidence is defined as evidence that "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Randle v. LaSalle Telecomm. Inc.,* 876 F.2d 563, 569 (7th Cir. 1989). Direct evidence includes discriminatory statements made by decision makers. *Gorence v. Eagle Food Ctrs., Inc.* 242 F.3d 759, 762 (7th Cir. 2001). Further, the statements must be made contemporaneously with, or causally related to, the employment decision and must demonstrate the speaker's discriminatory intent. *Markel v. Bd. of Regents of Univ. of Wisc. Sys.*, 276 F.3d 906, 910 (7th Cir. 2002)(*citing Conley v. Vill. of Bedford Park,* 215 F.3d 703, 711 (7th Cir. 2000)). Finally, evidence of inappropriate remarks not shown to be directly related to the employment decision may not support a direct-method-of-proof case, but, in connection with other evidence, might support a case under *McDonnell Douglas*'s indirect method. *Gorence*, 242 F.3d at 762.

Plaintiffs argue that Ms. Fry's alleged admission of discrimination is direct evidence of discrimination. (Pls.' Mem. Opp. Summ. J. at 8.) Plaintiffs further argue that, by admitting discrimination, Ms. Fry had knowledge of it, did nothing to

18

investigate or remedy the discrimination, and thus intentionally perpetuated the discrimination against Plaintiffs. (*Id.*)

As Defendants correctly point out, Ms. Fry's alleged admission was not one of *intentional* discrimination. On its face, if the trier of fact believes Ms. Fry actually made the comment, then the particular fact which is proved is that Defendants discriminated against Plaintiffs – unintentionally. The relevant case law clearly dictates that direct evidence must prove *intentional* discrimination without *inference or presumption.* Ms. Fry's statement does not expressly demonstrate animus nor an intent to discriminate.

Any indication of Ms. Fry's alleged discriminatory intent is a conclusion that can only be drawn by presuming that she had knowledge of discrimination and, by doing nothing, allowed it to go on. Further, a trier of fact must also presume or infer that intentional discrimination led to the particular decision not to pay Female Plaintiffs equally to men or promote them into higher paying positions. On the other hand, if a jury believes that Ms. Fry made the statement, she could argue that she only discovered the discrimination a few days prior to the meeting, and thus, she could not perpetuate discrimination of which she had just recently learned. Direct evidence is invariably rare to find, even in this case, where discrimination is allegedly admitted. However, all is not lost for Female Plaintiffs. Ms. Fry's statement can be used as

indirect evidence of discrimination.

## 2.  **Indirect Evidence**

A Title VII plaintiff utilizing indirect evidence must create a prima facie case of discrimination using the *McDonnell Douglas*, burden-shifting method.  *Johnson v. Univ. of Wisc.-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995).  If a plaintiff successfully establishes her prima facie case of discrimination, "a presumption of discrimination is created and the burden of production shifts to the defendants to present evidence of a legitimate, nondiscriminatory reason" for the challenged employment decision. *Vitug,* 88 F.3d at 515.  If the defendant satisfies its burden of production, the burden shifts back to the plaintiff to prove that the reasons offered by the defendants are a pretext for discrimination.  *Id.*  Of course, the ultimate burden of persuasion (not production) remains with the plaintiff at all times.  *Id.*

Neither the United States Supreme Court nor the Seventh Circuit has formulated a definitive standard for a prima facie case of Title VII wage discrimination.[16]  *Johnson,* 70 F.3d at 478.

---

[16]  Plaintiffs argue that they are presenting a wage discrimination claim and need not prove the particular elements of a prima facie case required specifically in the promotions context, as Defendants assert Plaintiffs must do in order to establish their prima facie case.  (Pls.' Mem. Opp. Mot. Summ. J. at 9.)  The Court notes that, in their Second Amended Complaint, Plaintiffs assert that Defendants engaged in discrimination in "hiring, evaluating, compensating and promoting" women.  (Sec. Am. Compl. ¶ 47a.)  However, at this stage of the proceedings, Plaintiffs are free to dispense with any of their theories of
(continued...)

However, the Seventh Circuit has previously held that in the wage discrimination context, plaintiffs' prima facie case must include evidence that they were paid less than similarly-situated males. *Id.*

Defendants argue that, pursuant to *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 618 (7th Cir. 2000), Female Plaintiffs must prove that they are substantially similar in terms of their qualifications, performance, experience and conduct to the males that Female Plaintiffs claim were treated better than them. (Defs.' Mem. Supp. Summ. J. at 8.)[17]  However, *Radue* also concludes that the factors determining whether two employees are

_____

[16](...continued)
liability as long as they do not attempt to amend their complaint and add new claims, which the Court finds has not occurred. Thus, since Plaintiffs only address their wage discrimination claim in their brief opposing summary judgment on Count I, the Court will analyze Plaintiffs' claims of disparate treatment using the wage discrimination test.  The Court notes however, that the facts in this case show that wage determinations are typically tied to hiring/promotions, and therefore, the Court must discuss the hiring/promotions practices employed by Defendants and cannot dispense of these facts entirely.

[17]  Plaintiffs also cite to *Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.,* 254 F.3d 644, 651 (7th Cir. 2001), a failure to promote case, to support their claim. (Defs.' Mem. Supp. Summ. J. at 8.) However, in *Hoffman,* the Court concluded that the individuals were not similarly situated because they did not hold the same or equivalent positions.  254 F.3d at 651.  The court found that one person was an assistant manager and the other was an assistant director who held a higher position than the assistant manager.  *Id.*  Here, Female Plaintiffs, Mr. Hutt and Mr. Ocasio are each Attorney Supervisors, but whether the men are in more senior positions within the Attorney Supervisor category is a disputed issue of material fact, as discussed below.

substantially similar depends on the context of the case. 219 F.3d at 617 (court differentiates between the factors it uses in disciplinary action cases as opposed to failure to transfer cases); *see also Chavez v. Ill. State Police*, 251 F.3d 612, 636 (7th Cir. 2001). *Radue* is an Age Discrimination Act, reduction-in-force case, and the case before this court is a Title VII wage discrimination case.

In addition, in *Senner v. Northcentral Tech. College*, 113 F.3d 750, 755 (7th Cir. 1997), the court held that summary judgment was inappropriate if the plaintiff's qualifications for the job were at issue. The parties contested whether the individual hired for the position was better qualified than plaintiff, and plaintiff argued that defendant failed to examine his qualifications. *Id.* However, the court ultimately affirmed summary judgment against plaintiff because plaintiff could not rebut defendant's legitimate business reason for not hiring him. *Id.*

This Court could not find Seventh Circuit precedent as to what constitutes "similarly situated" in the context of Title VII wage discrimination cases. However, in looking to other non-wage discrimination Title VII cases, as well as to the Equal Pay Act,[18] which requires a finding that employees are similarly situated to each other in order to sustain a claim, the Court concludes that

---

[18] 29 U.S.C. 206(d). The Equal Pay Act is discussed in greater detail below.

Female Plaintiffs must prove that they were performing substantially similar work, although not necessarily identical, at the same level of responsibility as the men which Female Plaintiffs claim are being paid more than them.

The parties do not contest that the duties of all Attorney Supervisors are identical and includes not only supervisory responsibilities over line attorneys but also requires them to participate in strategy, case development and trials, and handling personnel matters relating to the line attorneys. However, Ms. Fry claims that she filled the vacant positions with individuals who had specific skills required for those positions, although the record is replete with evidence that Attorney Supervisor positions do not require any unique skills beyond those mentioned in the job posting. In addition, Ms. Fry's admission that she moves supervisors around all the time, regardless of which division they are in, when she needs to fill a vacancy, further shows that the Attorney Supervisors perform similar duties irrespective of their division assignments. Defendants also admit that grade does not dictate what a person in a particular division will do, so an opening in D3 should arguably require the same qualifications and same duties for a misdemeanor assignment as for a felony or civil division assignment.

Finally, Defendants do not account for the contrary designation of D8 as both an Attorney Supervisor position, now

covered by the *Shakman* notice, and Defendants' claim that D8 is a *Shakman*-exempt Chief designation. Nor do Defendants attempt to explain the designations of Mr. Atkins and Mr. Reddy in *Shakman* Chief positions that require no skill beyond the job description. Neither does the Court have a description of the job duties of these gentlemen, nor can the Court determine how Mr. Atkins can simultaneously be a D6 and a Chief. Thus, issues of material fact exist concerning whether the duties of Attorney Supervisors, as well as Chiefs, are so much different from each other or that all Attorney Supervisors perform the same or similar duties regardless of their grade designation or assigned division. The Court must now determine whether Female Plaintiffs have identified similarly situated males who were paid more than them.

Ms. Rogers, a D5 in the appeals division, supervises 15 attorneys, graded D2 through D4, but she was not reclassified into a higher grade like fellow Attorney Supervisors Mr. Collins, Kevin Smith, Phillip Mullane, and Alan Sincox, who are each in various divisions. (Pls.' Add. Facts ¶ 81-84.) Mr. Smith was previously a D5, Mr. Collins was a D4, and each man supervised 9 and 12, respectively, Attorney Supervisors graded D4 and below. (*Id.*, Ex. 32.) Mr. Mullane and Mr. Sincox were previously graded D4, and each supervised 10 D4 Attorney Supervisors. (*Id.*) Thus, given the fact that neither side proffered enough evidence to substantially differentiate the duties between the divisions in which each of the

individuals worked, a reasonable jury could find that Ms. Rogers is similarly situated to Mr. Smith, Mr. Collins, Mr. Mullane, and Mr. Sincox, was paid less than them, and continued to be discriminated against when the aforementioned men were reclassified into higher grades while she remained a D5 and while she supervised more attorneys than any of them.

After her grade increase, felony supervisor Ms. Horn became a D4, but was still making less money than Edward Ptacek, a D6, and Gordon Mash, a D6, who each work in felony as well. (Pls.' 56.1 ¶ 23.) All three even work in the same division, so there does not seem to be any reason why there would be a disparity in their salaries, per Defendants' argument. Defendants also admit that Ms. Horn, Mr. Ptacek, and Mr. Mash all have the same responsibilities, and Ms. Horn actually has added supervisory responsibilities. (*Id.* ¶¶ 24, 25.) Thus, there is adequate evidence to show that Ms. Horn is arguably similarly situated to Mr. Ptacek and Mr. Mash.

When Mr. Ocasio and Mr. Hutt were hired to fill D3 vacancies in 1999 and 2000, Mr. Hutt was a line attorney, with no supervisory experience, and Mr. Ocasio was never previously employed with the Public Defender's Office. Nonetheless, both Ms. Kozlowski, a D1, and Ms. Williams, a D2, were paid less than the two men, although they were arguably similarly situated to them and even had more

experience supervising line attorneys. (Pls. 56.1 ¶ 16.)[19]  Thus,
a trier of fact could certainly conclude that Ms. Kozlowski and Ms.
Williams were similarly situated to Mr. Ocasio and Mr. Hutt, but
were paid less.

Defendants argue that Female Plaintiffs lack certain
qualifications, such as civil, administrative, or death penalty
experience, that do not make them similarly situated to the men
they identify.  (See gen., Defs.' Mem. Supp. Summ. J. at 18-25.)
Even if Plaintiffs need to prove that they have similar experiences
and qualifications as the men to whom they claim they are similarly
situated, the record is unclear as to what experience and
qualifications are material for the positions.  Defendants do not
specify what the exact requirements are for the higher graded
positions, and it is not clear whether these skills that Defendants
contend Female Plaintiffs do not have, are even necessary for the
particular positions.  Here, like in Hoffman, there are disputed
issues of material fact as to whether the Female Plaintiffs are in
the same or equivalent positions as the men, and, similar to the
facts in Senner, both parties dispute the requisite qualifications

---

[19]  Female Plaintiffs use other, non-Plaintiff women who are
in the lower-graded D slots as evidence of disparate treatment.
However, the case law is clear that disparate treatment focuses
on how plaintiffs were individually treated, while disparate
impact is concerned with the treatment of women as a group.
Therefore, the Court disregards evidence relating to the
treatment of specific, non-Plaintiff women as support for
Plaintiffs' disparate treatment claim.

of the Female Plaintiffs for the specific, higher graded positions filled by men.

Defendants also contend that Female Plaintiffs were not similarly situated because they were not on the "must hire" list or failed to approach Ms. Fry about a *Shakman*-exempt position. Assuming, *arguendo*, that Female Plaintiffs need to prove that they applied for the positions, the Seventh Circuit has held that a plaintiff can satisfy this element of her prima facie case by showing that her "employer uses a promotion system in which employees do not apply for promotions but rather are sought out by management" and that she would have applied for the position had she known about it. *Box v. A & P Tea Co.*, 772 F.2d 1372, 1377 (7th Cir. 1985). Thus, even if Female Plaintiffs are required to prove that they applied for a vacancy, a jury could find that Female Plaintiffs were unaware of any particular vacancy because the posting for D1 through D4 positions is continuous, and it is not clear on the face of the posting itself that the posting also applies to D5 through D8 positions. Moreover, prior to 2000, Defendants never even posted positions above D5 - a fact that tends to show Female Plaintiffs had no knowledge of job openings. Also, Female Plaintiffs may be confused about whether a D8 position now applies to Attorney Supervisor as well as Chief positions. Further, similar to *Box*, Female Plaintiffs arguably are not aware of Chief or Director position vacancies, and therefore cannot apply

for such positions, because Ms. Fry approaches candidates that she deems are qualified, or assumes that candidates will approach her. Given the aforementioned issues, if Female Plaintiffs are required to show that they applied for these positions, a trier of fact is the appropriate forum to determine whether Female Plaintiffs would have applied for these positions had they known about them.

Further, the Defendants have not adequately shown the Court that the alleged *Shakman* and *Shakman*-exempt positions require different qualifications or that the duties are not substantially similar. Plaintiffs argue that the only true *Shakman*-exempt position that has any policymaking duties at the Public Defender's Office is Ms. Fry's, and therefore, the process for hiring and promotions of all other positions is inconsistent and discriminatory. (Pls.' 56.1 Resp. ¶ 27-30.)

The question of whether a job is a policymaking position is an issue of fact. *Matlock v. Barnes,* 932 F.2d 658, 663 (7th Cir. 1991)(affirming denial of summary judgment on account of failure by either party to provide any depositions or affidavits describing the duties of the contested position and affirming judgment notwithstanding the verdict based on court finding no evidence that contested position was policymaking). Further, in political patronage cases, defendants bear the burden of proof to show that political affiliation is an appropriate qualification for the job. *Id.* (*citing Elrod v. Burns* 427 U.S. 347, 368 (1976); *Grossart v.*

*Dinaso*, 758 F.2d 1221, 1226 (7th Cir.1985)).

Although not a political patronage case, this Court finds that the Defendant here is the only party which realistically can produce the required evidence which shows that Chief and Director positions have been properly classified as *Shakman*-exempt pursuant to the *Shakman* requirements. Otherwise, the Court is relying on the conclusory claims made by Defendants. In addition, as mentioned above, the record contains conflicting evidence relating to the veracity of Defendants' contentions that certain grade levels, as well as all Chief and Director positions, are *Shakman*-exempt. Because the Defendants have not presented adequate evidence which properly identifies Chief and Director positions as *Shakman*-exempt, the Court finds that the qualifications, duties and responsibilities of alleged *Shakman*-exempt Chief and Director positions is a disputed issue of material fact.

The Court concludes that Female Plaintiffs have adequately established a genuine issue of material fact as to whether they can prove a prima facie case of disparate treatment. Defendants' legitimate, nondiscriminatory reason for the alleged discrimination is that Ms. Fry selected the best qualified candidates for each supervisory attorney vacancy. (Defs.' Mem. Supp. Summ. J. at 33.) However, Plaintiffs claim that Defendants' articulated reason is a pretext for discrimination.

Pretext is difficult to prove when an employer claims that it

promoted the best qualified candidate, because "evidence of the [plaintiff's] competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002), *cert. denied*, 123 S. Ct. 117 (2002)(internal citations omitted). If plaintiff's only evidence of pretext consists of her own opinions of her qualifications, she cannot successfully counter her employer's defense. *Id.* at 1180-181. The purpose of this rather stringent burden is to prevent courts from having to act as a "super personnel department that second-guesses employers' business judgments." *Id.* (internal quotations omitted). Further, an employer's use of subjective evaluation criteria is not an unlawful business practice under Title VII. *Id.* at 1176.

In the case at bar, if neither Ms. Williams nor Ms. Horn were qualified for a promotion to D3 at the time that Mr. Hutt and Mr. Ocasio were hired, then a jury might question how the women were qualified, only a few months later, for even *higher* graded positions than those offered to Mr. Hutt and Mr. Ocasio. Defendants claim that Ms. Williams and Ms. Horn were reclassified, not promoted, to D4 positions, but Defendants' own personnel documents clearly show that the box marked "promotion" is checked

for each of the women. Further, Ms. Fry testified that Ms. Williams's and Ms. Horn's pay increases coincided with the filling of vacant slots (Pls.' 56.1 ¶ 178, Ex. 5 at 80.) Ms. Fry also testified that she made the increases approximately one month after the April meeting with certain of the Plaintiffs. (Pls.' 56.1, Ex. 5 at 80.) However, the documents evidencing the women's promotion states an effective date of April 9, 2000 – exactly one day prior to the meeting where Ms. Fry allegedly made her admission about discrimination, but the same document is signed by Ms. Fry and dated April 18, 2002. Given the suspicious timing of the actual promotion or reclassification, and the contradictory dates and reasons why the women were placed in higher grades, a trier of fact could find that this is evidence of pretext.

Further, a jury could find that Ms. Fry did not actually hire the best qualified candidates for the vacancies, because Ms. Kozlowski had more experience than Mr. Ocasio and Mr. Hutt. In addition, a reasonable jury could conclude that wage disparities were not a result of the higher graded men having greater qualifications than the Female Plaintiffs, because Ms. Rogers was not reclassified along with the other men who supervise fewer attorneys than she supervises. Further, the qualifications for Chief and Director positions, as well as higher graded Attorney Supervisor positions, are in dispute. Therefore, a genuine issue of material fact exists as to whether any of the Female Plaintiffs

had the requisite qualifications for the Chief and Director vacancies, and consequently, whether they were more qualified than the men who obtained those positions.

Defendants have not specified what particular qualifications are required for D5 through D7, nor for Chief and Director positions, beyond the skills and experiences that Ms. Fry contends she finds useful in those positions. While a decisionmaker like Ms. Fry is free to change the qualifications for a position at any time, it appears disingenuous to post a notice for certain positions, continuously requiring one set of skills, and then claiming that certain of those positions require different skills not listed on the notice, which, not surprisingly, Female Plaintiffs do not possess. Further, as described previously, the record is silent as to the required qualifications for any positions above D5, and as of December 2000, for any positions above D8, not to mention the lack of any formal job description for Chief or Director positions. By arbitrarily changing a particular job's qualifications, Ms. Fry was arguably able to choose Mr. Hutt and Mr. Ocasio, as well as reclassify Mr. Collins, Mr. Mullane, Mr. Sincox and Mr. Smith instead of Female Plaintiffs. The question is raised then as to whether the women were actually less qualified than the males.

The Court finds it necessary to acknowledge at this point that Plaintiffs' evidence of pretext is not overwhelming. However, even

if Female Plaintiffs are unable to establish pretext with the facts provided above, the Court finds that Ms. Fry's alleged admission of discrimination, if believed, is certainly sufficient to rebut Defendants' articulated reason. The Court believes that the Female Plaintiffs have a right to present Ms. Fry's alleged statement to the jury, because a jury could reasonably conclude that Ms. Fry's alleged statement conflicts with Defendants' claim that it chose the best qualified candidates for the vacancies in the higher graded positions. Moreover, such a conclusion requires the trier of fact to make an inference or a presumption, which, as mentioned at the beginning of this analysis, was not appropriate in the context of direct evidence, but may be properly applied in the context of indirect evidence of discrimination. Thus, the Court finds that there is sufficient evidence for Female Plaintiffs' to maintain their disparate treatment claim.[20]

## B. **Disparate Impact**

Disparate impact does not require a showing of intentional

---

[20] As mentioned previously, Male Plaintiffs have not established that they were injured as a result of the alleged sex discrimination against Female Plaintiffs. (*See, supra*, n. 15.) In its briefs, Male Plaintiffs do not adequately refute Defendants' arguments and do not satisfactorily link the Female Plaintiffs' discrimination with Male Plaintiffs' alleged injury to establish causation. Thus, Male Plaintiffs' Title VII claim cannot withstand summary judgment under either the disparate treatment or disparate impact theories of liability.

discrimination against the plaintiff. *Vitug*, 88 F.3d at 513. Plaintiffs only need to show that a specific, facially neutral employment practice has a disproportionately negative effect on women. *Id.* Plaintiffs may utilize the disparate impact theory to challenge subjective selection processes as well as traditional, objective processes. *Id.* (citing *Watson v. Forth Worth Bank & Trust*, 487 U.S. 977, 990-91 (1988)). Once a plaintiff has met her burden in the disparate impact analysis, the defendant must show that its challenged practice serves a business necessity. *Price v. Chicago*, 251 F.3d 656, 659 (7th Cir. 2001). The plaintiff may still prevail if she can show that the defendant's business necessity defense is a pretext for discrimination. *Id.* at 660 (citing *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975)). However, "if the complaining party can demonstrate...that the elements of [the] decisionmaking process are not capable of separation for analysis," then plaintiffs need not identify a particular discriminatory practice, but the entire decisionmaking process may be analyzed as one employment practice. 42 U.S.C. § 2000e-2(k)(1)(B)(i).

Plaintiffs argue that the entire decisionmaking process, including the interview process, "must hire" list, and Ms. Fry's alleged job posting failures, make a breakdown of the employment process into a specific process untenable. (Pls.' Mem. Opp. Mot. Summ. J. at 22.) Defendants counter that its system of hiring,

promoting, etc. consists of two separate processes - one for *Shakman* positions and one for *Shakman*-exempt Chief and Director positions, each of which could be broken down and identified by several discreet elements. (Defs.' Mem. Supp. Sum J. at 7.) However, Female Plaintiffs question whether any *Shakman*-exempt Chief and Director positions even lawfully exist (*e.g.*, Pls.' Resp. 56.1 ¶¶ 64, 66, 70, 71), and therefore, arguably, Female Plaintiffs would contend that there is no separate process for *Shakman*-exempt Chief and Director positions.

The Court has previously found that issues of material fact exist as to whether Female Plaintiffs are even aware of vacant positions, whether they have the requisite qualifications for any vacant positions, and whether Defendants apply the entire hiring/promotions/reclassification process similarly to women as they do to men. Thus, the Court finds that Plaintiffs have adequately established the first element of the disparate impact analysis.

After Plaintiffs have established the first element of their prima facie case of disparate impact, they next must offer statistical evidence which shows that the practice in question has caused women to be excluded from the higher graded positions. *Watson*, 487 U.S. at 994. No particular mathematical formula exists to establish such causation, but the Supreme Court has "consistently stressed that statistical disparities must be

sufficiently substantial that they raise such an inference of causation." *Id.* at 994-95.[21] Additionally, statistics based on an applicant pool containing individuals lacking minimal qualifications for the job would be of little probative value." *Id.* at 997.

Plaintiffs allege that, as of August 2000, 38 men and 14 women were employed as supervisory attorneys at the Public Defender's Office. (Pls.' Add. Facts ¶ 175.) Both parties agree that 27 of the 35 men and 6 of the 14 women held positions beyond the D3 level. (Pls.' Add. Facts ¶ 176.) Thus, performing the requisite calculations, Female Plaintiffs point out that 71.05% of men advanced beyond D3, while only 42.86% of women supervisors similarly advanced. (Pls.' Add. Facts ¶ 178-179.) Applying these percentages to the "four-fifths rule," Plaintiffs allege that they "have made out a clear case of disparate impact" since women have

---

[21] The Equal Employment Opportunity Commission regulations provide that evidence of adverse impact can be found by using the "80%" or "four-fifths" rule, which states that:

> a selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5)(or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact.

29 C.F.R. § 1607.4D (2002). However, the Seventh Circuit has not unequivocally endorsed the "80% rule" as a result of the rule having been criticized on technical grounds. *Cox v. City of Chicago*, 868 F.2d 217, 220, n.1 (7th Cir. 1989). Nevertheless, the rule is useful as a starting point in disparate impact analysis. *Id.*

advanced beyond D3 at a rate less than 80% (women's advancement rate is 60.56%) than the rate of men similarly advancing. (Pl.'s Add. Facts ¶ 180.) Plaintiffs use D3 as a cut-off, because three individuals were recently hired to fill those positions, with no previous supervisory experience in the Public Defender's Office. (Pls.' Mem. Opp. Mot. Summ. J. at 21.)

In its disparate treatment analysis, the Court found that a material fact exists as to what the exact qualifications are for Attorney Supervisor positions, as well as for alleged *Shakman*-exempt Chief and Director positions. Thus, Plaintiffs have appropriately grouped together all of the supervisory attorneys in performing their requisite calculations, as a jury might reasonably find that all of the supervisory attorneys have the requisite skill and qualifications to move from a lower graded position to a higher graded position. Thus, the Court concludes that a finding of 71.05% of men who advanced beyond D3 positions, while only 42.86% of women similarly advanced is possible evidence of disparate impact. Additionally, women's advancement rate of 60.56% beyond D3 satisfies the 80% rule and is further evidence, although not definitive, of disparate impact.

The Court also finds that non-statistical, but probative evidence of disparate impact is Ms. Fry's testimony that the majority of women supervisors are at the bottom two rungs of the salary scale. (Pls.' Add. Fact ¶ 14.) Ms. Fry also admitted that

only two women were in positions at or above D5, and that the rest were in D1 through D4 positions. (*Id.* ¶ 13). If all the women arguably had the same, or at least similar, qualifications and skills as the men, then this implied admission that the majority of women are being paid less than men can be used to support Plaintiffs' statistical findings.

Defendants attack Female Plaintiffs' statistics with a host of complaints. Defendants argue that Plaintiffs' analysis was not verified by a statistical test, was not conducted by an expert, and did not control for the fact that many supervisory attorney positions were not vacant during Ms. Fry's tenure. Further, Defendants claim that Female Plaintiffs' sample size was too small, and that Plaintiffs group all supervisory attorney positions together, when they are not identical in qualification and responsibility, nor did the Female Plaintiffs apply for the said positions.[22]

The Court notes that the Seventh Circuit has not required that experts prepare or verify a plaintiff's statistics, especially given the particular statistics used here, which are extremely

---

[22] Defendants also cite to specific non-Plaintiff women who allegedly were promoted or hired into higher graded positions. (Defs.' Mem. Supp. Summ. J. at 13-14.) However, treatment of individual women is irrelevant in a disparate impact claim, where the Court is looking for evidence that women, as a *group*, were discriminated against. *See Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 581-82 (1978)(Marshall, J., concurring)(emphasis added).

uncomplicated. Further, the Court finds that a sample size of 14 women out of a total of 53 supervisory attorneys is not particularly tiny, unlike the Eighth Circuit's finding in *Harper v. Trans World Airlines, Inc.*, 525 F.2d 409, 412 (8th Cir. 1975), which found 6 class members to be too small for statistical purposes.

The Court also finds disingenuous Defendants' statement about the lack of vacancies for attorney supervisor positions. The record clearly shows that, during Ms. Fry's tenure, she filled at least three Director, nine Chief and nine Attorney Supervisor positions, and admitted that several Attorney Supervisor positions between D3 and D8 were vacant during her tenure. (Pls.' Add. Facts ¶ 63; Defs.' Resp. Add. Facts ¶ 63.)

Further, because Plaintiffs are claiming that women as a group were paid less than men, Female Plaintiffs need not show that they applied for certain higher graded positions or that the statistics do not adequately reflect the qualified applicant pool. In *Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977), the Supreme Court determined that there is no requirement that a statistical showing of disparate impact always be based on analysis of the characteristics of actual applicants. The Court reasoned that the "application process might itself not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory." *Id.*

Thus, if the evidence actually presented on its face "conspicuously demonstrates a job requirement's grossly discriminatory impact" the plaintiffs have met their burden. *Id.* at 331.

The Court finds *Dothard* applicable in this case. Female Plaintiffs have already established that all of the supervisory attorney positions may require similar skills, experiences, and responsibilities. Similar to *Dothard*, Female Plaintiffs need not show how many of the 14 women at the Public Defender's Office applied for higher graded positions, nor identify the qualified applicant pool, because on its face, the statistics show the substantial disparity between the wages of men and women, and Ms. Fry's admission that the majority of women are at the bottom pay grades conspicuously demonstrates wage disparity. Further, Female Plaintiffs argue that women are discriminated against based on the application and hiring process, including Ms. Fry approaching certain individuals whom she deems qualified for a position. Thus, determining the actual applicant pool could be an unrealistic task. Contrary to Defendants' assertions, Female Plaintiffs are not just comparing the number of men and women in different positions, but they are showing the percentage of women being moved into higher paid positions compared to the number of men similarly moving.

Most importantly, the Court concludes that Ms. Fry's alleged statement at the April meeting, admitting that discrimination occurred at the Public Defender's Office, is arguably sufficient

evidence to find Defendants' business necessity defense as pretextual. Defendants argue that it hired only the best qualified applicants who applied for the positions or were approached by Ms. Fry. However, Ms. Fry's statement, allegedly admitting that discrimination had occurred, although unintentionally, is the kind of information that a trier of fact must hear. Even coupled with arguably weak statistics showing that women were paid less than similarly situated men, if a reasonable jury could come to the conclusion that Ms. Fry made the alleged statement, then the Female Plaintiffs could prevail on their disparate impact theory. The Court acknowledges that disparate impact cases are difficult for plaintiffs to maintain, given the "high standards of proof" required of them. *See Watson*, 487 U.S. at 999. However, the Court is unwilling to grant summary judgment to Defendants on this claim when there is a material issue of fact as to whether Ms. Fry made this incriminating statement.[23]

## III. § 1983

Count II charges Defendants with violating 42 U.S.C. § 1983, based on violations of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, by discriminating against the Female Plaintiffs because of their sex. To maintain an action under § 1983, Plaintiffs must establish that

---

[23] However, the Court grants summary judgment to Defendants on Male Plaintiffs' disparate impact claim. (*See, supra,* n. 20)

a government official, acting under color of state law, violated their constitutional rights. *Stagman v. Ryan*, 176 F.3d 986, 999 (7th Cir. 1999). Plaintiffs claiming that they were denied their rights under the Equal Protection Clause of the Fourteenth Amendment must prove that (1) they are a member of a protected group and (2) the defendant acted with discriminatory intent. *New Burnham Prairie Homes, Inc. v. Vill. of Burnham*, 910 F.2d 1474, 1481 (7th Cir. 1990).

To prevail against a municipality under § 1983, plaintiffs must allege that the enforcement of a municipal policy, or some other deliberate municipal action, caused the alleged constitutional deprivation. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 122-23 (1992). Plaintiffs may prove the existence of a municipal policy or custom by showing "proof of an express policy causing the loss, a widespread practice constituting custom or usage that caused the loss, or causation of the loss by a person with final policymaking authority." *Kujawski v. Bd. of Commr's*, 183 F.3d 734, 737 (7th Cir. 1999). Courts use the *McDonnell Douglas* burden shifting method when analyzing § 1983 claims of intentional discrimination in employment decisions. *Dugan v. Ball State Univ.*, 815 F.2d 1132, 1135-6 (7th Cir. 1987).

The Court has already determined, in its analysis of Female Plaintiffs' Title VII disparate treatment claim, that a genuine issue of material fact exists as to whether Defendants

42

intentionally discriminated against Female Plaintiffs, and whether Defendants' articulated reasons for not paying them higher wages is pretext.[24] However, Female Plaintiffs cannot hold Defendants liable under § 1983, unless they prove that a policy or custom of Cook County resulted in a deprivation of Female Plaintiffs' rights.

To establish this portion of their § 1983 case, Female Plaintiffs' claim that Ms. Fry's hiring and compensation practices, including her perpetual violations of the *Shakman* requirements, caused Female Plaintiffs' constitutional deprivation.[25]    Before reaching this issue, the Court must first determine whether Ms. Fry

---

[24]  Defendants argue that Female Plaintiffs cannot prove their prima facie case under § 1983, because Female Plaintiffs did not apply for and were not qualified for promotion, and they failed to prove that similarly situated men received the desired positions.  (Defs.' Mem. Supp. Summ. J. at 39-41.)  However, the Court has previously addressed the same arguments raised by Defendants in the Court's analysis of Female Plaintiffs' Title VII claim.    Thus, the Court need not address Defendants' identical arguments here.

[25]  Female Plaintiffs also allege that Ms. Fry improperly sought the approval of Cook County Board President John Stroger for supervisory attorney hires.    (Pls.' Mem. Opp. Mot. Summ. J. at 23.)  However, even if Mr. Stroger's approval was improperly sought, Female Plaintiffs have not specifically alleged how his approval of Ms. Fry's recommendations have resulted in a deprivation of Female Plaintiffs' rights.  They only claim that he should not have given approval, but that allegation does not necessarily lead one to the conclusion that this was a "custom" or "policy" that led to sex discrimination against Female Plaintiffs.  *See, Baxter v. Vigo County School Corp.*, 26 F.3d 728, 736 (7th Cir. 1994)(affirming lower court's decision to dismiss complaint, because "[b]oilerplate allegations of a municipal policy, entirely lacking in any factual support that [such] a policy does exist, are insufficient" to establish a § 1983 claim.)

has decision making authority.

Pursuant to the Public Defender Statute, the "Public Defender shall appoint assistants, all duly licensed practitioners, as that Public Defender shall deem necessary for the proper discharge of the duties of the office, who shall serve at the pleasure of the Public Defender...The compensation of and the appropriate number of assistants...shall be fixed by the County Board...." 55 ILL. COMP. STAT. 5/3-4008.1. Further, the Cook County Board President appoints the Public Defender to office "with the advice and consent of the Board." 55 ILL. COMP. STAT. 5/3-4004.1.

The face of the Public Defender's statute appears to give authority to Ms. Fry to hire attorney supervisors, or any other attorneys, as she deems necessary. Nothing on the face of the statute requires the Board's, or President Stroger's, approval for hiring. The only factor that appears to be out of Ms. Fry's control is the compensation of and the number of assistants in her office. Further, pursuant to the statute, the only hiring decision that President Stroger appears to have is for the position of Public Defender, but he can only make an appointment to this position with the Board's consent.

Thus, a reasonable jury could conclude that Ms. Fry makes hiring decisions for the Public Defender's Office. In addition, Defendants admit that the interview committee makes recommendations to Ms. Fry concerning hiring certain candidates, but that Ms. Fry

is free to ignore their recommendation. According to Ms. Fry's owns statements, the Court finds that she appears to wield substantial power and control over what skills and qualifications candidates must possess to fill certain positions. Ms. Fry has also admitted that she makes recommendations to reclassify certain individuals into higher pay grades. Although she is not the final decisionmaker regarding reclassifications, she certainly has the power to control who gets reclassified and who does not based on who she decides should be recommended for reclassification. The Court finds that a trier of fact could conclude that Ms. Fry is the decisionmaker, and thus, her actions relating to hiring, promotions and reclassifications can subject both her and Cook County to liability under § 1983.

The Court finds that there are genuine issue of material fact as to whether Ms. Fry engaged in a custom or policy of discriminating against women. Even with Defendants' evidence showing that various women were hired or promoted into certain higher graded positions (Defs.' Mem. Supp. Summ. J. at 43), the Court is most concerned with the alleged statement made by Ms. Fry at the meeting with certain of the Plaintiffs admitting that discrimination had occurred.[26]   Even though Ms. Fry's alleged

---

[26]  Defendants raise other arguments defending its practices against Female Plaintiffs' § 1983 attack, but the Court need not address those arguments here, because a reasonable jury could conclude that, regardless of the other disputed facts in this
(continued...)

statement admitted unintentional discrimination, if the statement is considered in the context of the April meeting and the suspicious timing of the reclassification and promotions of certain of the Female Plaintiffs, as described above, a reasonable jury could conclude that Ms. Fry and the Public Defender's Office engaged in a custom or practice of discriminating against women. Thus, Female Plaintiffs' § 1983 claim should properly proceed before a jury.

## IV. **Equal Pay Act**

Female Plaintiffs charge Defendants with violations of the Equal Pay Act, 29 U.S.C. § 206(d) in Count III. The Equal Pay Act requires that employers compensate men and women equally for equal work. 29 U.S.C. § 206(d)(1). In order to establish a prima facie case under the Equal Pay Act, plaintiffs must prove that (1) different wages are paid to employees of the opposite sex; (2) the employees do equal work which requires equal skill, effort, and responsibility; and (3) the employees have similar working conditions. *Id.; Howard v. Lear Corp. EEDS & Interiors*, 234 F.3d 1002, 1004 (7th Cir. 2000). The burden then shifts to defendants, who must prove that the earnings disparity is justified based on its merit system, seniority system, a system which measures

---

[26](...continued)
case, Ms. Fry's alleged statement admitting discrimination is probative evidence of a "policy or custom" of discrimination against women.

earnings by quantity or quality of production, or a differential based on any factor other than sex. *Id.*

Specifically, plaintiffs "must establish, based upon actual job performance and content – not job titles, classifications or descriptions that the work performed...is substantially equal." *Fallon v. State of Ill.*, 882 F.2d 1206, 1208 (7th Cir. 1989)(internal citations omitted). The "substantially equal" requirement does not necessitate proof that the work is identical. *Id.* However, the jobs must share a "common core of tasks" that make a *significant portion* of the two jobs identical. *Id.* at 1209 (emphasis added). Once plaintiffs show the common core of tasks, the defendants must proffer evidence showing that additional duties exist, which make the jobs "substantially different. *Id.*

Female Plaintiffs compare themselves to Edward Ptacek, Gordon Mash, and David Hirschboeck, all Attorney Supervisors holding D6 positions. (Pls.' Mem. Supp. Mot. Sum. J. at 2-3; Pls.' 56.1 ¶¶ 20, 21, 23.) From 1993 to 2002, Mr. Ptacek was an Attorney Supervisor in the evening narcotics division, and is now assigned to felony. (Defs.' Add. Facts ¶ 65.) Mr. Mash worked in traffic from 1998 to 2002, and is now stationed in felony. (*Id.* at 69.)[27]

---

[27] In their Rule 56.1 Reply to Defendants' Additional Material Facts, Plaintiffs dispute whether Mr. Mash is a "Supervisory attorney"[sic] based on Ms. Fry's deposition testimony where she declared that he is Chief of Traffic. (Pls.' Reply Defs.' Add. Facts ¶ 69.) However, in their own 56.1 Statement of Uncontested Facts, Plaintiffs state, and Defendants
(continued...)

Mr. Hirschboeck worked in delinquency from 1995 through 2001, and is now in the felony division. (*Id.* at 68.)

Defendants admit that, in addition to performing the same duties as Mr. Ptacek and Mr. Hirschboeck, Ms. Horn, currently in felony, has the additional responsibility of supervising juvenile trial advocacy workers. (Pls.' 56.1 ¶¶ 24, 25.) In addition, Ms. Rogers and Mr. Mash both share similar supervisory duties over 15 and 21 attorneys, respectively. (Pls.' 56.1, Ex. C.) Female Plaintiffs argue that Mr. Mash was a misdemeanor supervisor at one point, and earned more than Ms. Kozlowski and Ms. Williams, who also supervised misdemeanor line attorneys. (Pls.' Mem. Supp. Mot. Summ. J. at 2-3.) Defendants deny that Mr. Mash was a misdemeanor supervisor, but a document in the record entitled "Proposed Attorney Reclassifications," dated November 2000, identifies Mr. Mash as a "Supervisor-Mis" at D6. (Pls.' 56.1 ¶ 30, Ex. G.) This document seems to suggest that Mr. Mash was in the misdemeanor division at some point, and at least as of November 2000.

The Court has already established that a genuine issues of material fact exist as to whether Attorney Supervisors perform similar functions and have similar responsibilities from division to division. Thus, the Court concludes that a reasonable jury

---

[27](...continued)
agree, that Mr. Mash is not a Chief. (Pls.' 56.1 ¶ 60; Defs.' 56.1 Resp. ¶ 60.) Thus, Mr. Mash's status as a Chief of Traffic or Attorney Supervisor is a disputed material fact.

could determine that Female Plaintiffs and Mr. Ptacek, Mr. Mash, and Mr. Hirschboeck share a "common core" of tasks in their positions, which predominantly involve supervisory functions and the practice of law.

Defendants argue that Mr. Ptacek, Mr. Mash, and Mr. Hirschboeck do not share a common core of tasks with the Female Plaintiffs and do not share the same working conditions. (Defs.' Resp. Pls.' Mot. Summ. J. at 4.) Defendants contend that Mr. Ptacek's position at the evening narcotics court was hard to staff and carried more responsibilities than the Female Plaintiffs' respective positions.[28] (Defs.' Add. Facts ¶ 65.) Defendants claim that filling the position of evening Attorney Supervisor in narcotics court has been traditionally difficult. (*Id.* ¶ 65.) Further, Defendants argue that, because of the evening hours which the narcotics court operates, Mr. Ptacek must work independently and resolve problems without the resources of the Public Defender's Office, which is closed at night. (*Id.* ¶ 65.) Defendants also claim that Mr. Mash and Mr. Hirschboeck have developed an expertise in their respective areas of practice. (Defs.' Resp. Mot. Summ. J. at 10.)

---

[28] Female Plaintiffs argue that, in approximately 1992, Ms. Horn had also worked in the evening narcotics courtroom, but was still paid less than Mr. Ptacek. (Pls.' Reply Defs.' Add. Facts ¶ 66.) However, as Defendants correctly assert, the relevant time period for an Equal Pay Act claim is three years preceding Plaintiffs' cause of action, thus, the Court will not consider evidence prior to August 1997. *See* 29 U.S.C. 255(a).

In *Stopka v. Alliance of American Insurers*, 141 F.3d 681, 685-86 (7th Cir. 1998), the Seventh Circuit concluded that plaintiff shared the same title as her male counterparts but was not performing substantially similar work. Despite her claims to the contrary, the Court found that plaintiff's job was substantially different than the male vice presidents' jobs, because plaintiff did not have insurance policymaking skills, which the Court determined was core to defendant's business. *Id.* at 686.

Not unlike the plaintiff in *Stopka*, Female Plaintiffs and Mr. Mash, Mr. Ptacek, and Mr. Hirschboeck share the same title of Attorney Supervisor, but unlike the parties in *Stopka*, their duties were substantially similar as well. The Court is not persuaded by Defendants' argument that the Female Plaintiffs worked in different departments than Mr. Mash, Mr. Ptacek and Mr. Hirschboeck and therefore, possessed different areas of expertise or did not work in the same conditions. The Court finds that the Public Defender's Office does not have a core business as did the *Stopka* defendant. Rather, various areas of the law are "the core" of the Public Defender's Office. In addition, Ms. Fry's statement that she moves supervisors from different divisions around is further evidence that all Attorney Supervisors, regardless of their current division, can and are, expected to perform work in other divisions at a moment's notice. Although the departments are different, the type of law being practiced is different, and the client population

is different, the proper test is whether the duties were "substantially similar" - not identical.

However, Mr. Ptacek's position in evening court raises an issue of material fact as to whether his responsibilities or skills, in that specific position only, were different from, or more substantial than, Female Plaintiffs'. Nevertheless, in viewing the facts in the light most favorable to Female Plaintiffs, a jury could conclude that both the Female Plaintiffs and the identified men supervised attorneys, practiced law and supervised cases, and therefore, their responsibilities and skills were substantially similar. Further, they all worked in similar conditions: at the Public Defender's Office or in a courtroom.

Defendants also contend that Ms. Horn, Ms. Williams, Ms. Kozlowski and Ms. Rogers earn the same amount of money as the male supervisory attorneys who are in similar grade levels. (Defs.' Mem. Supp. Summ. J. at 45.)[29] However, this circuit has determined that job titles or classifications are irrelevant in finding wage discrimination. Further, Female Plaintiffs are arguing that their

---

[29]   Defendants also argue that Female Plaintiffs cannot compare their salaries to the men in Chief or Director positions, because the Chiefs and Directors have more job responsibilities and supervise more attorneys than Attorney Supervisors, the positions which Female Plaintiffs hold. (Defs.' Mem. Supp. Summ. J. at 47, 49.)   In their briefs, Female Plaintiffs do not compare their alleged salary discrepancies with any Chief or Directors; rather, they limit their analysis to three men in Attorney Supervisor positions.   However, the Court has already determined that the qualifications and duties of Chief and Director positions have not been adequately established.

designation into the lower paying grades is the actual discrimination – that the work they perform entitles them to the same salary as the men designated at the higher grades and performing similar work, specifically, Mr. Mash, Mr. Ptacek and Mr. Hirschboeck.

Female Plaintiffs have raised a triable issue of fact as to whether they can prove a prima facie case under the Equal Pay Act. However, Defendants have not adequately set forth a reason other than sex for the salary discrepancies. Defendants have admitted that they do not increase salaries based on merit or quality of work. (Defs.' 56.1 Resp. ¶ 31-33.) Instead, Defendants argue that any salary discrepancies between men and women performing similar work can be accounted for by the lack of vacant supervisory attorney positions at the Public Defender's Office (Defs.' Mem. Supp. Summ. J. at 50) or the seniority of the higher graded male Attorney Supervisors (Defs.' Resp. Pls.' Mot. Summ. J. at 13). Plaintiffs counter that, while Mr. Mash, Mr. Hirschboeck, and Mr. Ptacek have been supervisors longer than Female Plaintiffs, Mr. Hutt and Mr. Ocasio had no supervisory experience, but yet were paid more than women who had been supervisors for a longer period of time. (Pls.' Add. Facts ¶ 33-36; Pls.' 56.1 Resp. 56.1 ¶ 36.)[30]

Next, the Court finds that Defendants' "no vacancy" rebuttal

---

[30]   The Court has previously found that a trier of fact could determine that Mr. Hutt and Mr. Ocasio are performing similar work and have similar skills as Female Plaintiffs.

fails.   Defendants argue that Ms. Fry has not filled any vacancies higher than D3 during her ten-year reign as Public Defender, because no higher graded positions have become vacant.   (Defs.' Resp. Pls.' Mot. Summ. J. at 11.)   However, Defendants had previously admitted that several Attorney Supervisor positions above D3 were vacant between 1996 through 2000, including at least one D6 position and one D8 position.   (Pls.' Add. Facts ¶ 63; Defs.' Resp. Add. Facts ¶ 63.) Thus, although Mr. Mash, Mr. Hirschboeck and Mr. Ptacek were promoted to their positions prior to Ms. Fry joining the Public Defender's Office, Ms. Fry could have filled additional vacancies that the record shows may have existed.

Further, a reasonable jury could infer from Ms. Fry's alleged admission at the April meeting with Plaintiffs that women were discriminated against at the Public Defender's Office and paid less than similarly situated men.   As the Court has acknowledged repeatedly in this opinion, it cannot ignore Ms. Fry's alleged admission of discrimination, because if proved, it is an admission of liability.   A reasonable jury could hear this evidence and conclude that, not only did Defendants violate Female Plaintiffs' rights under Title VII, but they also violated Female Plaintiffs' rights under § 1983 and even the Equal Pay Act.   Thus, for the aforementioned reasons, the Court cannot grant summary judgment on Female Plaintiffs' Equal Pay Act claim.

## V.  Shakman Consent Decree

In Count IV of their Complaint, Plaintiffs allege that Defendants violated the notice provisions of the *Shakman* consent decree. (Sec. Am. Compl. ¶¶ 54-59.) The *Shakman* judgment prohibits Cook County from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment with respect to one who is at the time a governmental employee, upon or because of any political reason or factor." *Shakman v. Democratic Org. of Cook County*, 481 F. Supp. 1315, 1358 (N.D. Ill. 1979), *vacated by Shakman v. Dunne*, 829 F.2d 1387 (7th Cir. 1987, *cert. denied*, 484 U.S. 1065 (1988). To establish a *Shakman* violation, Plaintiffs must prove that a political reason or factor was the cause of the complained of decision. *Shanahan v. City of Chicago*, 82 F.3d 776, 780 (7th Cir. 1996); *see also Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir. 1992). Once a plaintiff shows cause, the burden shifts to the defendant to show that it would have made the same decision notwithstanding the protected conduct. *Shanahan*, 82 F.3d at 780.

In *Shanahan*, the Court affirmed summary judgment against plaintiff, because he proffered no evidence to rebut defendant's claims that political motivation played no part in its employment decision. *Id.* at 781. The plaintiff alleged that he was demoted because of his refusal to hire politically favored candidates. *Id.* at 780. However, plaintiff presented no evidence to rebut

54

defendant's affidavits, which denied knowledge of the political associations of the plaintiff or the persons alleged to be political favorites. *Id.*

Similar to the facts in *Shanahan*, Plaintiffs do not present the Court with any evidence that Defendants made employment decisions based on the political affiliations of either the Plaintiffs or the individuals hired to fill the attorney supervisor vacancies. Further, Plaintiffs did not present the Court with any evidence to rebut the claims in Ms. Fry's affidavit that she had no knowledge or information about the political affiliation or activities of the Plaintiffs or the candidates Defendants hired.

Instead, Plaintiffs argue that Defendants' failure to properly post available job opportunities, needlessly classifying jobs as *Shakman* exempt, and Ms. Fry seeking President Stroger's approval for hiring or promoting, is a result of the Public Defender's Office's attempt to circumvent *Shakman* and fill positions with political cronies. (Pls.' Mem. Supp. Sum. J. at 28-31.) However, the Seventh Circuit has clearly required that plaintiffs prove that political motivation led to the unlawful hiring, and Plaintiffs have not presented, nor has the Court itself found, any case law to the contrary. Without more, Plaintiffs' allegations are nothing but speculation of general political motivation in Defendants' hiring process and cannot sustain a *Shakman* claim.

Even if Ms. Fry improperly sought President Stroger's approval

for hiring and promoting individuals, or failed to post notices of job opportunities and erroneously designated certain positions as *Shakman*-exempt, these actions alone do not imply that improper political considerations led to the ultimate hiring or promotion decisions. If the Court allows Plaintiffs to prevail without showing that a political motivation played any part in filling the attorney vacancies at the Public Defender's Office, then the Court would be allowing a misuse of the protections provided by *Shakman*, and its purpose would be thwarted. Thus, Defendants' motion for summary judgment on Count IV is granted.

## VI.  **Equal Protection**

Finally, Count V alleges that Defendants violated Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by arbitrarily and capriciously denying Plaintiffs pay increases and promotions without any rational basis. (Defs.' 56.1 ¶ 235.) In order to state a cause of action under the equal protection clause, plaintiffs must prove that they were intentionally treated differently from others who were similarly situated and that there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000).[31]

---

[31]  Defendants argue that Plaintiffs must prove that animus motivated Defendants' decision under *Olech*. (Defs.' Mem. Supp. Summ. J. at 54.) However, the Court need not address this argument here, because the record shows that Plaintiffs' equal
(continued...)

Although Plaintiffs are correct in asserting that the number of individuals in a class is immaterial to establishing a claim under *Olech*, Plaintiffs still must prove that others were not treated similarly to them. The Seventh Circuit has clearly held that plaintiffs cannot maintain an equal protection claim if the record shows that others similarly situated to plaintiffs were not treated any differently from the plaintiffs. *See Hedrich v. Bd. of Regents of the Univ. of Wisconsin Sys.*, 274 F.3d 1174, 1183 (7th Cir. 2001); *Simonsen v. Bd. of Educ. of the City of Chicago*, No. 01-3081, 2002 WL 230777, at *5 (N.D. Ill. February 14, 2002)(holding that plaintiff's admission that he was *not* treated differently from other similarly situated teachers pleads him out of an equal protection claim under a "class of one" theory).

In this case, Plaintiffs have proffered evidence showing various instances where other Attorney Supervisors, and even Chiefs, have been allegedly treated arbitrarily by Defendants' system of compensation, promotion, and hiring. (Pls.' 56.1 Resp. ¶¶ 87-91, Ex. 6). For instance, Chiefs appear to be graded anywhere from D3, D5, D6, D7, D8 to D9 (Pls.' 56.1 Resp. ¶ 87, Ex. 6), but according to Defendants, Chiefs should be D8 or D9, with

---

[31](...continued)
protection claim under the *Olech* theory is unsustainable on other grounds.

only a Training Chief at D5.[32]  In addition, among the Attorney
Supervisors in felony, Mr. Collins and Mr. Mullane were each a D4,
while Mr. Smith was a D5 and Mr. Howard was a D6.  (*Id.*)  Thus, Mr.
Mullane was arguably treated similarly to Mr. Collins, and paid
less than both Mr. Smith and Mr. Howard, but Mr. Mullane is not a
Plaintiff.   Further, Plaintiffs argue that Defendants have not
explained why Ms. Horn, Ms. Williams, Mr. Fletcher, and Mr. Miller
each remain at either D4 or D3, while Mr. Hirschboeck, Mr. Mash,
and Mr. Ptacek in juvenile, misdemeanor, and felony, respectively
earn more at D6.   (*Id.*)   However, looking at the same document
which allegedly proves Plaintiffs' point, apparently other
individuals are also earning less than Mr. Hirschboeck, Mr. Mash,
and Mr. Ptacek, including Attorney Supervisors Crystal Marchigiani
a D3 in juvenile, Howard Winston a D3 in felony, and Mr. Matsopola
and Lisa Brean, both a D3 in the misdemeanor division.   (*Id.*)
Curiously, Plaintiffs do not mention Ms. Rogers nor Ms. Kozlowski
in making their equal protection arguments.

    Plaintiffs devote much of their time attempting to show the

---

[32]    The Court is unsure of whether Mr. Hirschboeck, Mr.
Mash and Mr. Ptacek are the sole individuals that Plaintiffs
wished to single out as the individuals similarly situated but
treated more favorably than Plaintiffs. Plaintiffs also argue
that various Chiefs, some identified and others unidentified by
Plaintiffs, were treated differently from each other and some
were graded similarly to Plaintiffs.  (Pls.' Mem. Opp. Mot. Summ.
J. at 33-34.) The Court concludes that these issues are moot,
because in viewing the facts in the light most favorable to
Plaintiffs, Plaintiffs still would not prevail, because the
record shows that others were treated similarly to Plaintiffs.

arbitrary and irrational nature of Defendants' hiring and promotions practice, but to succeed with an equal protection claim under *Olech*, Plaintiffs must also prove that they were singled out and that no one was similarly mistreated. Plaintiffs have failed to meet this burden. Similar to the facts in *Simonsen*, the record here shows that Defendants have arguably treated numerous Attorney Supervisors as unfairly as it treated Plaintiffs and has similarly paid these non-Plaintiffs less money than other Attorney Supervisors. Proof that other, non-Plaintiff supervisory attorneys are arguably mistreated by Defendants' hiring and promotions system results in Plaintiffs' inability to maintain an equal protection claim under the "class of one" theory.

**IT IS HEREBY ORDERED THAT**, for the reasons set forth above, Defendants' Motion for Summary Judgment on Count I of Male Plaintiffs' claim, and Counts IV and V, be, and the same hereby is **GRANTED**.

**IT IS FURTHER ORDERED**, that Defendants' Motion for Summary Judgment on Count I of Female Plaintiffs' claim, and Counts II and III be, and the same hereby is, **DENIED**.

**IT IS FURTHER ORDERED**, that Plaintiffs' Motion for Summary Judgment on Counts III and IV, be, and the same hereby is, **DENIED**.

DATE: December 30, 2002          ENTER:

_____

ARLANDER KEYS
United States Magistrate Judge